JEFFERSON COUNTY, *Appellant*; v. St. LOUIS COUNTY.

Division Two, January 31, 1893.

113   619
125    60

113   619
88a  517

1. **Counties, Powers of.** Counties are political subdivisions of the state and possess only such powers as the state, by its lawmaking power has conferred upon them.

2. **Municipal Corporations:** NEGLIGENCE: DAMAGES. A municpal corporation is not answerable in damages for the negligent acts of its officers in the execution of such powers as are conferred on the corporation or its officers for the public good.

3. **Counties:** CONNECTING BRIDGES: CONTRIBUTION. An act authorizing the erection by a private corporation of a toll bridge connecting the plaintiff and defendant counties, provided that the counties might purchase the bridge and make it a free one. This was done, each county contributing one half of the purchase price, but the superstructure of the bridge being in an unsafe condition the plaintiff county rebuilt it, the county court of the defendant county refusing to join in the expense on the ground that its financial condition would not warrant the outlay. *Held,* that an action to compel con-

tribution from the defendant county would not lie, for, under General Statutes, 1865, chapter 53, section 1, which provides that each county shall determine what bridges shall be built and maintained at the expense of the county, it was left to the discretion of the county court to decide whether such bridge was a necessity and whether the condition of its revenue was such that it could incur the expense.

*Appeal from St. Louis Circuit Court.*—HON. W. W. EDWARDS, Judge.

AFFIRMED.

*Fred Wislizenus* and *Charles H. Kleinschmidt* for appellant.

(1) Plaintiff and defendant became tenants in common of the bridge involved in this case. *First.* They had authority to buy under the act providing for the building of the bridge. Missouri Laws, Acts of 1856–1857, p. 379. *Second.* Under the general statutes these counties had the power to purchase this bridge. Wagner's Statutes, sec. 9, p. 441; *Sheidley v. Lynch*, 95 Mo. 497. *Third.* The counties having the general right to purchase realty and personalty, it cannot be collaterally questioned in any given case. *Chambers v. St. Louis*, 29 Mo. 543; *Land v. Coffman*, 50 Mo. 243; *Martindale v. Railroad*, 60 Mo. 510; *Hovelman v. Railroad*, 79 Mo. 640. *Fourth.* The county court of St. Louis county, between the time of the adoption of the "Scheme," and the legal ascertainment of the fact that it had been adopted, was a *de facto* body. Its acts are binding. *Adams v. Lindell*, 72 Mo. 198; s. c., 5 Mo. App. 197; *State ex rel. v. Sutton*, 3 Mo. App. 388; *City of St. Louis v. Stoddard*, 15 Mo. App. 177. (2) In respect to the ownership of this bridge the parties to the suit are not *quasi* corporations, but are charged with the duties of individuals in a similar position. *Hannon v. St. Louis Co.*, 62 Mo. 317; *Swineford v. Franklin Co.*,

73 Mo. 282; *Clark v. Adair Co.*, 79 Mo. 537; *Carrington v. City of St. Louis*, 89 Mo. 215; Dillon's Municipal Corporations, sec. 985; *Moulton v. Scarborough*, 71 Me. 269; *Oliver v. Worcester*, 102 Mass. 500; *Eastman v. Meredith*, 36 N. H. 295. A *quasi* corporation may, under circumstances, be *mandamused*. *State ex rel. Bartle v. Coleman*, 33 Mo. App. 470; *Corrigan v. Gage*, 68 Mo. 541; *Halpin v. Campbell*, 71 Mo. 493. When a *quasi* corporation contracts with reference to a duty, the performance of which cannot be compelled, the contract will be enforced. *Waupun v. Chester*, 61 Wis. 401; *Pottsville Burrough v. Norwegian Township*, 14 Pa. St. 543; *Town v. Rutland,* 84 Ill. 289. (3) When one co-tenant refuses to participate in necessary repairs, the other may make them at his own expense, and sue for contribution. Story's Equity, sec. 1235, 1236; *Coffin v. Heath* 6 Met. 80; *Fowler v. Fowler*, 50 Conn. 256; *Alexander v. Ellison*, 79 Ky. 156; *Armstrong v. Bryant*, 16 S. W. Rep. 463; *Dickson v. Williams*, 11 Cush. 258; *Holloway v. Holloway*, 97 Mo. 640. Especially is this true when the work done is a duty to the public. *Haven v. Mehlgarten*, 19 Ill. 91. (4) The account is not barred as to any of its items, for it is a running one. *Ring v. Jamison*, 66 Mo. 424.

*John R. Warfield, A. McElhinney, R. Lee Mudd* for respondent.

(1) Counties are parts of the sovereign state government, and, as such, cannot sue or be sued, unless where specifically permitted by statute. *First.* This proposition is elementary and axiomatic, and needs no authority or precedent to support it. Precedent, however, is not wanting as appears by the following cases: *Hunsacker v. Borden*, 5 Cal. Rep. 288; *Hustings v. City and County of San Francisco*, 18 Cal.

59; Elliott on Roads and Streets, p. 42. *Second.* No such right existed at common law. *Russell v. County of Devon*, 2 Term. Rep. 671; *Lyall v. St. Clair Co.*, 3 McLean's Reports, 580. *Third.* No such authority is given by the statute. 1 Revised Statutes, 1889, art. 3, p. 799. (2) The county court had no power or authority to purchase the bridge or make repairs. *Reardon v. St. Louis Co.*, 36 Mo. 555; *Barton Co. v. Walser*, 47 Mo. 189; *Steines v. Franklin Co.*, 48 Mo. 167; *State ex rel. v. Shortridge*, 56 Mo. 125; *Potter v. Douglass Co.*, 87 Mo. 125; *Book v. Earl*, 87 Mo. 246; *Walcott v. Lawrence*, 26 Mo. 272. There can be no such a thing as implied power in a county court. *Alderson v. St. Charles Co.*, 6 Mo. App. 420; *Reardon v. St. Louis Co.*, 36 Mo. 555. All the legal effect the deed could have was to extinguish the franchise and rid the counties of a nuisance. (3) The principle asserted by the appellant that co-tenants or joint owners are liable to contribute for repairs is not of universal application. *Calvert v. Aldrich*, 99 Mass. 74; Freeman on Co-tenancy & Partition [2 Ed.] sec. 262; 4 Kent's Commentaries [13 Ed.] top p. 370; *Walter v. Greenwood*, 29 Minn. 87; *Thurston v. Dickinson*, 2 Rich. Eq. 317; *Taylor v. Baldwin*, 10 Barb. 590; *Crest v. Jack*, 3 Watt's Rep. 238; *Baird v. Jackson*, 98 Ill. 78; *Prentice v. Jansen*, 79 N. Y. 478; *Kidder v. Rixford*, 16 Vt. 169; *Kelsey v. Church*, 4 Cent. Rep. 99; Washburn on Real Property [5 Ed.] secs. 17, 18, top p. 697, side p. 421. In addition to the above a corporation cannot take an estate in joint tenancy. *Telfair v. Howe*, 3 Rich. Eq. 235. (4) The statute of limitation begins to run from the date of each transaction. *Loeffel v. Hoss*, 11 Mo. App. 133; *Harrison v. Hall*, 8 Mo. App. 167. The judgment of the court below was for the right party and should, therefore, be affirmed.

GANTT, P. J.—By an act of the General Assembly in 1857, "The Lemay Ferry Bridge Company of St. Louis and Jefferson counties" was incorporated and granted the exclusive right to erect a bridge across the Meramac river at Lemay ferry, in the counties of St. Louis and Jefferson, and take tolls as prescribed in said act. By section 7 the county court of St. Louis county was authorized to subscribe to the stock of said company, and by section 8 the county court of Jefferson county was permitted to subscribe to said stock all unexpended moneys of the road and canal fund or the fund arising from the sale of five hundred thousand acres of land donated by the general government to the state of Missouri, and by section 10 the two counties were authorized "at any time to purchase the stock of *said bridge and make it a free bridge at pleasure, after having purchased said stock.*"

The bridge was built and, the company having executed a deed of trust, upon default the bridge was sold and bought by John C. Hall and was owned by his estate in 1876. Upon a petition of citizens of Jefferson county to purchase and make it a free bridge to public travel, and after much negotiation between Hall's estate and the county courts of the two counties, the two courts purchased the bridge for $10,000, each paying $5,000, and a deed made to both and their assigns forever, November 27, 1876. Neither county ever purchased any of the stock.

The scheme and charter separating St. Louis county and the city of St. Louis went into effect October 22, 1876, and was judicially declared in March, 1877, by this court. The old county court of St. Louis county did not know this, however, and continued to act for the county under its old boundaries as a *de facto* court until the decision in this court was promulgated.

The county court of the new county organized under the "scheme," April 30, 1877.

A. conference was had on the twenty-fifth of June, 1877, and Jefferson county's proposition to repair the bridge for travel was rejected by St. Louis county court "for the reason that the financial condition of St. Louis county will not permit the granting of the request for aid as made by Jefferson county." At this time the bridge was in a dangerous condition and the county court of St. Louis ordered it to be closed as dangerous to travel. Thereafter Jefferson county repaired the bridge in a substantial way. It expended $2,925 in November, 1877, in rebuilding it. In 1883 it spent nearly $800 in repairing the piers. In 1885 a new iron bridge was erected by the St. Louis Bridge & Iron Company for Jefferson county at a cost of $9,870. The old superstructure was entirely removed and an entirely new bridge erected in its stead. The evidence substantially showed that the old bridge when purchased was worthless, and the two counties in their joint answer to a dower suit by Hall's widow alleged it was not worth $20.

In 1886 Jefferson county brought this action against St. Louis county in equity for contribution to the expenses of repairing and rebuilding. The position of Jefferson county is that by the purchase the two counties became tenants in common of the bridge and its franchises. That from that time it was the private property of the two counties, and as to that, the counties were not not quasi municipal corporations, but were charged with all the duties toward each other and toward third persons, which would exist in case natural persons were owners, and that, as a tenant in common is liable to his co-tenant for contribution for necessary repairs made by the latter upon notice, so St. Louis

county is liable to Jefferson county for her share of the cost of repairing and rebuilding this bridge.

St. Louis county controverts these claims and contends that it is simply a part of the state; that certain powers are conferred upon it by law to enable it to perform certain functions for the state; that it is not a corporation at all, much less a private corporation with powers and liabilities of a private citizen or natural person; insists that it is only amenable to the laws governing counties in regard to bridges generally. That by the statute its county court was vested with a discretion as to whether it would expend its moneys in further repairs or rebuilding this bridge; that its county court decided it was not to the interest of St. Louis county to make said repairs; that her finances would not admit of it, and, having so decided and notified Jefferson county, it was in nowise liable for the maintenance of said bridge.

I. The liability of counties in this state has been settled by adjudications of this court. They are held to be "*quasi* corporations granted by the legislature for the purposes of public policy;" in other words, political subdivisions of the state having just such powers and only such as the state by its lawmaking power confers upon them.

In *Reardon v. St. Louis Co.*, 36 Mo. 555, it was held by this court that counties are not responsible for the neglect of duties *enjoined on them unless the action is given by the statute*. In that case the plaintiff sought to recover of the county damages for the death of her husband, who was killed by stepping off a county bridge over the Gingras river in said county. She alleged negligence in failing to provide proper guards to the bridge. It was held that "the counties as such have no control over the repair of roads; they choose

the county court and there their power ceases. The statute gives to the county court in express terms the care and superintendence of the highways and bridges of the county and confers upon it all the powers requisite to the execution of the trust, and it derives all its authority, not through the county, but directly from the statute.'' The doctrine thus announced has since been approved in *Hannon v. St. Louis Co.*, 62 Mo. 313; *Swineford v. Franklin Co.*, 73 Mo. 279; *Clark v. Adair Co.*, 79 Mo. 536.

But in *Hannon v. St. Louis Co.* a distinction was drawn between those duties imposed by the state for the discharge of a public duty and those in which, owing to their nature, the county as to such would be regarded as *a private corporation*. And it was there held that as to its own property no sound reason could be given why a county ''should not be held answerable to the same rules as would prevail were a municipal or private corporation, or an individual, a party defendant.''

It becomes then a most material inquiry here as to what was the relation of St. Louis county to this bridge. In *Clark v. Adair Co.*, *supra* this court unanimously concurred in holding that the county was not liable for damages caused by a defect in a county bridge, because no action was authorized by the statute and because the duty of maintaining bridges on the highways was a duty enjoined for public purposes. That case was decided with a full knowledge of the distinction drawn in the *Hannon Case*, and by it we understand this court most clearly held that as to a county bridge the county did not bear such a relation as would impose on it the liability of a private corporation or individual.

This brings us then to the contention as to this particular bridge. Did the county under the facts of this case bear a different relation to the public and

individuals in regard to this bridge from that it bore to the ordinary public bridges in its territory? When this act, incorporating the Lemay ferry bridge, was passed, there was a general statute which provided that, "each county court shall determine what bridges shall be built and maintained at the expense of the county, and what by the road districts." Sec. 1, Chap. 53, General Statutes, 1865. By sections 14 and 15 of that chapter, provisions were made for bridging water courses which divided counties as follows:

"Section 14. If a bridge be necessary over any water course which divides one county from another, the county courts of *both* counties shall unite in appointing a commissioner for building said bridge, and the expense shall be defrayed by both counties, in proportion to the amount of the tax of each, to be ascertained by the tax list taken next before the contract for building such bridge shall be made.

"Section 15. When one moiety equal to one half of the expense of building such bridge shall be raised by subscription, both county courts shall forthwith unite to cause such bridge to be built, and shall pay the residue of the expense of the bridge in the proportion hereinbefore directed."

A bridge over a stream constituting the boundary of two counties, constructed under the above sections, would unquestionably be a public bridge, and neither county would bear any greater responsibility for its negligent maintenance than for one of the public bridges lying wholly within its bounds. When the Lemay ferry bridge was incorporated, the legislature clearly gave the county courts of St. Louis and Jefferson counties an option. They could purchase stock in a toll bridge, or they might jointly purchase the whole and make it a free bridge. From this record, it is clear, neither county court availed itself of its priv-

ilege to become a stockholder in the enterprise, and to become liable as such.

The two courts were by section 10 authorized to buy and make it a free bridge. The record, of the Jefferson county court shows conclusively that it was in obedience to a petition of citizens of Jefferson county "to take steps to *make it a free bridge to public travel*," that it made overtures to St. Louis county to join in the purchase. After it was bought no tolls were ever exacted or received by either county. The moneys devoted to its purchase were the road and canal funds of each county, funds set apart by law for public highways. This particular bridge then was acquired by the two county courts under a provision of law, enabling them to open it as a free bridge to the traveling public. It was paid for by public funds. Neither county received or intended to exact any tolls or derive any pecuniary advantage to itself beyond the accommodation of the general public of each county. The evident purpose of the legislature, in permitting the counties to become stockolders was to enable them to convert this toll bridge into a free bridge. When so purchased we are unable to see in what respect it differs from a bridge constructed originally by two counties under the general statutes. There is no recognition in the statutes anywhere of a different policy to be pursued by the county courts in regard to a bridge thus jointly purchased for a free bridge and, one erected as a free bridge. As said in a very similar case (*Commissioners v. Thompson*, 106 Ind. 534) "When such a bridge is purchased, and the private interest extinguished, it takes its place in the system of public bridges in the county or counties in which it is situate. The several municipalities then become subject to all the rights and liabilties in respect to it that pertain to all other public bridges."

If a public bridge, then, as to such a structure, the county is liable for repairs to it, or for injuries occurring for a want of repairs in its character as a "*quasi* municipal corporation" and not as a private corporation. But if the test of liability of municipal corporations proper for torts is applied, the county under the facts here shown would not be liable.

In the case of *Ulrich v. City of St. Louis*, 112 Mo. 138, it was held in an opinion by SHERWOOD, C. J., and THOMAS, J., that notwithstanding the city had imprisoned the plaintiff under its charter powers to collect a fine due the city for breach of ordinance, the city was not liable for the injury to plaintiff caused by a kick from a mule owned by the city which plaintiff was required to hitch to a vehicle and known to be dangerous. The court *in banc* held, that, notwithstanding the city was compelling plaintiff to work out his fine in its workhouse and using his services, yet it could not be said that in conducting its workhouse, it should be "regarded as doing so as a means of profit or private municipal gain or revenue." That "the rule of law is well settled in this state that a municipal corporation is not answerable in damages for the negligent acts of its officers in the execution of such powers as are conferred on the corporation or its officers for the public good." Citing *Murtaugh v. St. Louis*, 44 Mo. 479; *Hannon v. St. Louis Co.*, 62 Mo. 313, and many other cases in this state; 2 Dillon on Municipal Corporations, sec. 965a.

This last citation is peculiarly applicable here, lest it be said that the doctrine of this court above alluded to refers only to those duties imposed by *general laws* on the counties and cities. Judge DILLON, after commending the opinion of Mr. Chief Justice GRAY in *Hill v. Boston*, 122 Mass. 344, for its analysis of the leading judgments on this subject in England and America as so intrinsically valuable that it should be studied by all

who desire to trace the law on this subject, says: "*The principle of the decision* was stated to be that, according to the well-settled law of Massachusetts, *no private action, unless authorized by express statute,* can be maintained against a town or city for the neglect of a public duty imposed upon it as the agent of the public, by *general* laws for the benefit of the public, and from the performance of which the corporation receives no profit or special advantage. Whether the result would have been different if the duty in question had been imposed on the city by a *special charter* was not, of course, decided, but the reasoning is evidently against any distinction based upon the particular mode in which *such a duty* is prescribed. Whether the neglected duty involves a liability, depends, in the judgment of the court, upon the *nature of the duty;* that is to say, whether it is imposed for the pecuniary profit or other special advantage of the city (if so, the city is liable); or whether it is a duty imposed upon the city as a public instrumentality of the state, without pecuniary or other special advantage to the city (if so, the city is not liable)."

This court having invariably held that in building and maintaining bridges upon public highways a county court was an instrumentality of the state and the work one for the benefit of the public and not for the pecuniary profit of the county, can it make any difference in principle that the court was authorized to obtain a free bridge by purchase, under a special act, instead of erecting it, under the general law? The answer is obviously no.

Our conclusion is then that, upon receipt of the deed of conveyance from the estate of Hall, the two counties, as *quasi* municipal or public corporations, owned this bridge, just as they would have owned a bridge built by them over this dividing stream under

the general laws of the state.   Starting from this then, and granting, what we think the evidence abundantly shows, that the superstructure was worthless and dangerous and that Jefferson county court desired to so repair or rebuild the bridge as to make it a safe highway, could Jefferson county compel St. Louis county to join in building said bridge, or, having refused, can St. Louis county be compelled to contribute to the repairs and rebuilding which followed upon its refusal to contribute.   It must be borne in mind that no contract was made between these two counties.   Whatever liability is cast upon either must result from the relationship they bear each other in law.

The statute nowhere made it obligatory upon these counties to build this bridge save in the case of a private subscription of one half of the cost.   In all cases the statute confided to the respective county courts the duty of determining when a joint bridge was necessary, and in no section of the law is any compulsory provision made for repairing or rebuilding such a bridge, if out of repair or destroyed.   We have seen that as to the ownership of the bridge they cannot be regarded as private individuals and therefore subject to the duty of tenants in common for reasonable repairs, and, as there is no common law obligation on the counties to erect or keep in repair the bridges within their limits, we must look to the statutes on this subject.   The statute in force then and now only authorized the two county courts to bind their respective counties, when each of said courts should determine *it was necessary*.   *State ex rel. v. Coleman*, 33 Mo. App. 470.   Having agreed upon the necessity, they are required to *unite* in appointing a commissioner for building said bridge, and then provides how it shall be paid in proportion to the taxable wealth of each county.   In no other way is any liability authorized to be created.   There is not an inti-

mation that one county court can compel an adjoining county to contribute against its will to a joint bridge.

The law remains to-day substantially as it did in 1845, and the fact that an action like this has never been maintained and that no general assembly has ever thought it proper by express statute to permit such an action goes far to show it was denied for good reasons.

Our bridge law is substantially like that of Illinois. In *Commissioners v. Commissioners*, 100 Ill. 631, it was held, that, in the absence of an express statute authorizing it, an action for contribution in such a case could not be maintained; that the statutory provisions were exclusive.

In *Brown v. Merick Co.*, 18 Neb. 355, upon a statute almost identical, the Illinois case *supra* was approved in terms, and it was held that in the absence of a contract there is no power in one board to erect or repair a bridge across such stream and compel the other to pay a part of the cost.

We think the law wisely left it to the discretion of the county court of St. Louis county to determine whether in its opinion said bridge was a necessity to its inhabitants, and the condition of its revenue such that it could afford to incur that expense. Manifestly it had nothing to do with the convenience of the public outside of said county. The people have the power to change the majority of their county court every two years. If they deem a bridge a great necessity and the revenue of the county will justify it they have a remedy for compelling an agreement with a sister county, but the presumption must be that each court is doing what is best for its own people.

It follows the circuit court committed no error in denying the relief prayed and its judgment is affirmed. All concur.