THE STATE ex rel. CLARK COUNTY v. GEORGE E. HACKMANN, State Auditor.

In Banc, January 26, 1920.

1. **COUNTY WARRANTS: Validty.** Warrants issued to pay the current expenses of the year, and warrants which when issued were within the anticipated revenues and income of the year, although all the anticipated revenue and income are not collected, are valid obligations of the county.

2. ————: **Cash Basis.** It was the purpose of the Constitution to establish the cash system by limiting the amount of tax which may be imposed by a county for county purposes, and by limiting the expenditures in any given year to the amount of revenue which

State ex rel. Clark County v. Hackmann.

such tax would bring into the treasury for that year; but that does not mean that debts contracted within the anticipated revenues are invalid because the revenue collected is insufficient to pay all of such debts, nor does it mean that each debt shall be met with cash as it accrues, but it means that during the fiscal year the cash will be sufficient to pay legally contracted debts whose amount does not exceed the anticipated revenues if the anticipated revenues are collected and rightfully disbursed.

*Held*, by GOODE, J., dissenting, that a county, which has issued warrants which it is unable to pay, because disappointed in the collection of taxes and other anticipated revenue, may discharge those warrants out of the surplus revenue of a later year; but it cannot pile up debts for current expenses without destroying the cash system and nullifying the restrictions as to the rates of taxation provided by Section 11 of Article 10 of the Constitution which says that the maximum rates there designated shall "apply to taxes of every kind and description, whether general or special, except taxes to pay valid indebtedness now existing, or bonds which may be issued in renewal of such indebtedness."

3. **COUNTY INDEBTEDNESS: Public Purpose: New Debt.** The discharge of a valid existing indebtedness is the application of revenue raised by taxation to a county public purpose, and bonds voted by two-thirds of the qualified voters, to be used in paying judgments against the county based on valid warrants for ordinary current expenses, constitute a new debt created for a county public purpose. The bonds, when sold, are not payable to the judgment creditors, but are new obligations of the county, although the money arising from their sale is used to pay the judgments.

*Held*, by GOODE, J., dissenting, that a debt cannot be contracted under Section 12 of Article 10 of the Constitution to discharge warrants issued for the usual annual expenses, or judgments on them, when the warrants are not paid because of a deficiency in the expected income from taxes authorized by Section 11 to be levied and other sources of revenue. The power to create and fund debts given by Section 12 cannot be used to nullify the restrictions to certain maximum tax-rates for ordinary current expenses provided by Section 11.

*Held*, also, that bonds issued to discharge warrants issued in paying ordinary current expenses, or judgments based on such warrants, is not a new debt in the constitutional sense, but such bonds merely change the form of the debt, without increasing it.

4. ———: **Election: Effect of Subsequent Specific Statute: Self-Enforcing Constitutional Provision.** The Constitution (Sec. 12, Art. 10) grants authority to a county to contract obligations for a county public purpose in excess of the yearly income and revenue, pro-

vided "the assent of two-thirds of the voters thereof voting at an election to be held for that purpose" is first obtained, and that gives authority to hold such an election, and although the statute provides no machinery for holding such an election, if the ordinary and usual machinery provided for obtaining an expression of the legal voters on such public questions was used, the election was valid. And a subsequent act of the Legislature specifically providing for such bond elections must be considered as dispelling all doubt on the matter, rather than as conferring original authority to hold such an election.

*Held*, by GOODE, J., dissenting, that no authority had been given the county by legislative grant to issue bonds to pay judgments, or even to issue negotiable paper, or to ascertain the will of the voters upon such a matter; and as said constitutional provision is negative in form and restrictive on the power of public corporations to incur debts and on the authority of the Legislature to authorize them to become indebted, and as counties have no power except what is conferred upon them by statute or a self-enforcing constitutional provision, the county had no power to issue the bonds.

## Mandamus.

WRIT ISSUED.

*James H. Talbott*, Prosecuting Attorney, for relator; *Charles Hiller, T. L. Montgomery* and *Charles & Rutherford* of counsel.

(1) "No county . . . shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose." Mo. Constitution, sec. 12, art. 10; State ex rel. v. Wilder, 197 Mo. 1; Barnard & Co. v. Knox Co., 105 Mo. 382; Mt. Grove Bank v. Douglas, 146 Mo. 42; Trask v. Livingston Co., 210 Mo. 582; State ex rel. v. Neosho, 203 Mo. 40. (2) Municipal bonds which are valid when issued are not rendered void by the misapplication of the money received from their sale. 19 R. C. L. 1019; Anderson Co. v. Beal, 113 U. S. 227; Cairo v. Zane, 149 U. S. 122; Jones v. Camden,

44 S. C. 319, 51 Am. St. 855; Rose v. Road District, 275 Mo. 603. (3) The Constitution does not specify the purpose for which a county may become indebted. State ex rel. v. Orear, 210 S. W. 392. (4) Taxes may be levied and collected for public purposes only. Mo. Const. sec. 3, art. 10; State ex rel. v. Orear, 210 S. W. 396; State ex rel. v. St. Louis, 216 Mo. 90; Citizens Sav. & Loan Assn. v. Topeka, 20 Wall. 664. (5) The payment of municipal indebtedness is a public and corporate purpose. Stone v. Chicago, 207 Ill. 492; Natl. Ins. Co. v. Mead, 48 L. R. A. (S. D.) 787; State ex rel. v. Orear, 210 S. W. 392; Abbott on Public Securities, sec. 116, p. 250, note 99; City of New Orleans v. Clark, 95 U. S. 644. (6) The meaning of the words "in any manner or for any purpose" as employed in Section 12, Article 10 of the Constitution of Missouri. District of Doon Twp. v. Cummins, 142 U. S. 366, 35 L. Ed. 1047; Council Bluffs v. Steward, 51 Iowa, 385; Grant v. Davenport, 36 Iowa, 396; McPherson v. Foster, 43 Iowa, 48; Mosher v. School Dist., 44 Iowa, 122; Bank v. District, 86 Iowa, 330; People v. Railroad, 253 Ill. 191; East Moline v. Pope, 224 Ill. 386; Schnell v. Rock Island, 232 Ill. 89; Davis v. County Court, 38 W. Va. 614; French v. Burlington, 42 Iowa, 107; Anderson v. Orient Ins. Co., 88 Iowa, 579; Spillman v. Parkersburg, 35 W. Va., 614; Brown v. Corey, 175 Pa. 528; Lake Co. Commrs. v. Rollins, 130 U. S. 662, 32 L. Ed. 1062; Litchfield v. Ballou, 114 U. S. 190, 29 L. Ed. 132.; Beard v. Hopkinsville, 23 L. R. A. 402-408, note; Voss v. Water Co., 66 L. R. A. 100; Superior Mfg. Co. v. School Dist., 28 Okla. 293; Springfield v. Edwards, 84 Ill. 626; Trask v. Livingston Co., 210 Mo. 582; State ex rel v. Neosho, 203 Mo. 40. (7) If the proceeds of the sale of the bonds in question are not applied to the payment of the judgments against relator county, then, the power existing to issue them, they will be valid and binding obligations of the county, and its indebtedness will have been increased to the extent

44—280 Mo.

of the par value of the bonds. Rose v. Springfield Road Dist., 275 Mo. 603; Anderson Co. v. Beal, 113 U. S. 227; Cairo v. Zane, 149 U. S. 122; Jones v. Camden, 44 S. C. 319. (8) The issuance and sale of refunding bonds creates a new debt and should be included in determining the amount of the debt limit. District of Doon Twp. v. Cummins, 142 U. S. 366, 35 L. Ed. 1044; State ex rel. v. McGraw, 12 Wash. 541; Atkinson v. Ross, 43 Wash. 290; Berkholz v. Dinnie, 6 N. D. 511; Heins v. Lincoln, 102 Iowa, 69; Stone v. Chicago, 207 Ill. 492; Edmunson v. School Dist., 98 Iowa, 639; Thompson v. School Dist., 102 Iowa, 94; Smith v. Ormsby, 20 Wash. 396; Laws 1919, p. 179, sec. 1; Secs. 1249 and 1252, R. S. 1909. (9) The issuance and sale of refunding bonds does not create a new debt, and such bonds should not be taken into account in computing the debt limit of a county. Abbott on Public Securities, sec. 209, p. 431; Board of Commrs. v. Aetna Ins. Co., 90 Fed. 222; Maish v. Ariz. Ter., 164 U. S. 599; Goeman v. Sinking Fund Commrs., 25 Fed. 567; Board of Commrs. Lake Co. v. Platt, 79 Fed. 567; Lyon Co. v. Keene, 100 Fed. 337; Los Angeles v. Teed, 44 Pac. 580. (10) A judgment against the State Auditor commanding him to register the bonds in question will conclude all the tax-payers in relator county as to the validity of the bonds and the tax levied to pay the same, and will be *res adjudicata.* Sec. 1275, R. S. 1909; Ransom v. City of Pierre, 41 C. C. A. 585, 101 Fed. 665. (11) The several judgments against relator county sought to be funded by the issuance of the bonds in question are conclusive against it as to the validity of the debts merged into the judgments. Haishman v. Knox Co., 122 U. S. 316; State ex rel. v. Rainey, 74 Mo., 234; Scotland Co. v. Hill, 140 U. S. 41; Sec. 2103, R. S. 1909; Sioux City Ry. Co. v. Osceola County, 45 Iowa, 168, 52 Iowa, 26; Jones v. Hubbard, 193 Mo. 165. (12) That the Legislature has not enacted a special law for the holding of an election such as the one in question, is not material, since the general election laws furnish

all the machinery necessary to enable the voters to register their will on the question of incurring the debt here sought to be evidenced by the issuance of bonds. Article 8, Mo. Constitution; Articles 2 and 5, Chap. 43, R. S. 1909. (13) Where an election is authorized by constitutional, statutory or charter provision, and there is no special law providing for the manner of holding and conducting such election, it may be held and conducted under any general law governing elections for counties or municipalities. The inference is that such an election is to be held and conducted in the usual way, when some unusual or different way is not provided. State ex rel. v. M. K. & T. Railroad, 164 Mo. 211; Laws 1919, p. 179, sec. 2; Bank v. Commissioners, 116 N. C. 339, 366; Kimbley v. City of Owensboro, 195 S. W. 1089; O'Bryan v. City of Owensboro, 113 Ky. 680. (14) In the absence of a statutory form of ballot any form of ballot giving the voter full knowledge of the question or proposition involved will be sufficient. Dick v. Scarborough, 73 S. C. 154; Kemp v. City of Hazelhurst, 80 Miss. 447, 467; State ex rel. v. Stauffer, 197 S. W. (Mo.) 251; State ex inf. v. Clardy, 267 Mo. 384, 385; State ex rel. v. Jones, 226 Mo. 199; Evans v. McFarland, 168 Mo. 727; Russell v. Gray, 164 Mo. 95; State ex rel. v. Hackman, 273 Mo. 698. (15) In the absence of a statutory form of notice of an election, one giving full and proper information will be sufficient. Rosebstock v. Supervisors, 112 Miss. 127; Kemp v. Hazelhurst, 80 Miss. 443; Abbott on Pub. Securities, secs. 127, 128. (16) County warrants must be paid out of the revenue of the year of their issuance, and if sufficient revenue is not collected in such year to pay them, then payment must be deferred until such time as there is a surplus in the county treasury after the payment of all the obligations of the year. K. C. Ry. Co. v. Thornton, 152 Mo. 574; State ex rel. v. Payne, 151 Mo. 663; Holloway v. Board of Commrs., 240 Mo. 601; Andrew Co. v. Schell, 135 Mo. 41.

*Frank W. McAllister*, Attorney-General, and *Shrader P. Howell*, Assistant Attorney- General, for respondent.

(1) It is the duty of the State Auditor to determine whether there is authority of law for the issuance of the bonds; and, if such exists, whether all the conditions of the Statutes applicable thereto have been complied with in the particular issue presented for registration. Sec. 1275, R. S. 1909; State ex rel. Dexter v. Gordon, 251 Mo. 311; State ex rel. Pike County v. Gordon, 268 Mo. 326; Thornburg v. School District, 175 Mo. 12. Respondent represents the tax payers in the bond issuing county, and may urge any question attacking the validity of the bond issue. Ransom v. City of Pierre, 101 Fed. 665. (2) It is clearly the intention of the framers of the Constitution to place the public business of the county on a cash basis to limit the ordinary county expenditures to the income and revenue for each year. Sec. 12, Art. 10, Mo. Constitution; Book v. Earl, 87 Mo. 251; Trask v. Livingston Co., 210 Mo. 595; Holliway v. Howell Co., 240 Mo. 613; State ex rel. Christian Co. v. Gordon, 265 Mo. 188. (3) The only manner by which an indebtedness in excess of the income and revenue for any year may be lawfully created is with the assent of two-thirds of the qualified voters voting at an election held for that purpose, as provided by Section 12 of Article 10 of the Constitution. State ex rel. v. Wabash Ry., 169 Mo. 576; Barnard v. Knox County, 105 Mo. 388; Anderson v. Ripley Co., 181 Mo. 61; Bank v. Douglass Co., 146 Mo. 56; Decker v. Diemer, 229 Mo. 330; Campbell v. State, 99 Pac. (Okla.) 778; Beard v. City of Hopkinsville, 95 Ky. 241; Brown v. City of Corry, 175 Penn. 528; 5 McQuillin, Munic. Corp. sec. 2206, p. 4683. (4) Section 12 of Article 10 of the Constitution authorizes a bond issue in excess of the annual current revenue of a county only when a new indebtedness is incurred; and since the instant bond issue does not constitute a new obligation but is merely

an attempt to fund an indebtedness theretofore created
by the issuance of county warrants, represented by the
several judgments herein, the bonds are invalid and
void. State ex rel. v. City of Neosho, 203 Mo. 76, 95;
5 McQuillin, Munic. Corp. sec. 2770, p. 4798; City of
Poughkeepsie v. Quintard, 136 N. Y. 278; Edmundson
v. School Dist., 98 Iowa, 645; County Comm. v. Etna
Life Ins. Co., 90 Fed. 222; Abbott's Pub. Sec., sec. 209,
p. 431; 1 Dillon, Munic. Corp. sec. 202, p. 379; Geer
v. Board, 97 Fed. 435; City of Los Angeles v. Teed,
112 Cal. 326; Leach v. Comm., 97 Ky. 124; Palmer v.
City of Helena, 19 Mont. 67; Wallace v. Camp, 200 Pa.
St. 223; Powell v. City of Madison, 107 Ind. 114;
Veatch v. City of Moscow, 18 Idaho, 317; Lake County
v. Standley, 24 Cal. 9; Hamilton Co. v. Savings Bank,
157 Fed. 25; In re Menefee, 22 Okla., 374; Blanton
v. Commrs., 101 N. C. 532; Ewart v. Mallery, 16 S. D.
156. (5) The mere conversion of the county warrants
into judgments gave the creditors no new rights in re-
spect to the source of payment. The judgments repre-
sented a past indebtedness based upon county warrants
theretofore issued and could only be paid out of the
surplus revenues derived from the tax levy for ordinary
county expenses within the limitations prescribed by
Section 11 of Article 10 of the Constitution. Anderson
v. Ripley County, 181 Mo. 65; Railway v. Thornton,
152 Mo. 574; State ex rel. Egger v. Payne, 151 Mo. 663;
Holliway v. Howell Co., 240 Mo. 613; 1 Dillon, Munic.
Corp. sec. 210, p. 417; Abbott's Pub. Sec. sec. 414, p. 831;
Webb City v. Cartersville, 142 Mo. 116; Smith v.
Broderick, 107 Cal. 650; Arnold v. Hawkins, 95 Mo.
569; United States v. Macon Co., 99 U. S. 591; Railroad
v. Baker, 6 Wy. 369; Striker v. Comm., 77 Fed. (Colo.)
567; United States v. King, 74 Fed. 493; State ex rel. v.
Wabash Ry., 169 Mo. 576. (a) Although all the defenses
in respect to the validity of the county warrants may be
held to be concluded by the rendition of the judgments
thereon, yet it is permissible to inquire into the nature
of the original claim on which the present bond issue is

founded for the purpose of determining from what funds
such judgments, now represented by the bonds, shall be
paid    Railroad v. Baker, 6 Wy. 394, 397; Black v.
McGonigle, 103 Mo. 202; Brunson v. Caskie, 9 L. R. A.
(N. S.) 1002; Brownville v. Loague, 129 U. S. 505;
Wilder v. County Court, 41 Fed. 512.    (b) The courts
do not look with favor upon any plan the practical effect
of which results in increasing the indebtedness of the
county in violation of the mandatory constitutional pro-
vision. The law does not permit that to be done indi-
rectly which could not be done directly.    State ex rel.
v. City of Neosho, 203 Mo. 72; Litchfield v. Ballou,
114 U. S. 192; Black v. McGonigle, 103 Mo. 202; Ar-
nold v. Hawkins, 95 Mo. 573; State ex rel. Christian Co.
v. Gordon, 265 Mo. 188; Railroad v. Baker, 6 Wy. 398.
(c) An indebtedness incurred by operation of law falls
within the constitutional prohibition of Section 12 of
Article 10 to the same extent as that incurred by the
voluntary act of a municipality. Barnard v. Knox Co.,
105 Mo. 389; State ex rel. v. Wilder, 197 Mo. 9; Lake
County v. Rollins, 130 U. S. 662.    (6) The bonds are,
furthermore, invalid and void for the reason that the
Legislature has made no provisions for holding an elec-
tion for the purpose of funding the judgment indebted-
ness of the county based upon county warrants thereto-
fore issued for the purpose as disclosed by the record
in this case.    Franklin v. School District, 271 Mo. 593;
State ex rel. v. Edwards, 151 Mo. 472; State ex rel. v. Van
Brown, 75 Mo. 537;    State ex inf. v. Duncan, 265 Mo.
42; Laws 1919, p. 178.    The Legislature has made provi-
sion by a special enactment, for the holding of elections
to vote bonds for the purpose of erecting courthouses,
jails, building roads and school buildings. Secs. 1260-
1269, R. S. 1909; Laws 1913, p. 121; Secs. 83-92, Laws
1917, p. 470; Sec. 10777, R. S. 1909, as amended by
Laws 1911, p. 394; Secs. 1249-1259, R. S. 1909.

GRAVES, J.—Original proceeding in mandamus. By
such process the relator seeks to compel the respondent

State ex rel. Clark County v. Hackmann.

State Auditor to register certain bonds of Clark County, in the aggregate sum of over $103,000. Clark County had issued warrants which were not paid. In the application for the alternative writ here, which was taken as for the alternate writ, it is averred that such warrants were duly issued. This is not very material, because it further appears that suits were brought upon these warrants and judgments had against the county in the aggregate sum of $97,004.39, which judgments bore interest at the rate of six per cent.

At the May Term (1917) of the county court of said county, upon a petition signed by more than 300 qualified voters and taxpayers, the county court called a special election upon a proposition to incur an indebtedness of $103,944.04, and evidence the same by bonds in said sum, out of the proceeds of which these judgments were to be paid. The issue submitted to the voters read:

"For incuring an indebtedness in the sum of one hundred and three thousand, nine hundred and forty-four and 04/100 dollars ($103,944.04), and issuing bonds therefor, to pay judgment against the county in said sum—Yes.

"For incurring an indebtedness in the sum of one hundred and three thousand, nine hundred and forty-four and 04/100 dollars ($103,944.04) and issuing bonds therefor, to pay judgments against the county in said sum—No.

"Erase the clause you do not favor."

The proposition was carried by an overwhelming majority of the votes cast at such election, the vote being 1,011 for the proposition to 110 against it. The bonds were issued, and respondent refused to register them. His return is before us, and in it are his several reasons for refusing to register the bonds. They go to the meat of the case, and will be noted in the course of the opinion. A motion by relator for judgment on the pleadings closed the issues in the case.

I. It is suggested that the warrants which furnished the basis of the judgment mentioned were the accumulations of years. Also that many other counties are situated just as is Clark County. We need not blind our eyes to facts which everybody knows. The counties of the State, in anticipation of their yearly revenue, issue warrants against such revenue. The county authorities know from the assessed values and the tax rates just what revenue should come in for the year. They often issue warrants up to the very limit of the anticipated revenue, and these warrants we have held to be valid obligations of the county. This, on the theory that the warrants represent valid contracts made during the year. By valid contracts we mean contracts within the anticipated revenue of the year. Thus in Trask v. Livingston County, 210 Mo. l. c. 594, it is said:

*Valid Warrants.*

"It has been uniformly construed that this provision of the Constitution permits the anticipation of the current revenues to the extent of the year's income in which the debt is contracted or created, and prohibits the anticipation of the revenues of any future year."

So also in State ex rel. v. Johnson, 162 Mo. l. c. 629, it is said:

"It was ruled in Book v. Earl, 87 Mo. 246, that 'the evident purpose of the framers of the Constitution and the people who adopted it was to *abolish* in the administration of county and municipal government, *the credit system,* and establish the cash system by limiting the amount of tax which might be imposed by a county for county purposes, and limiting the expenditures in any given year to the amount of revenue which such tax would bring into the treasury for that year.' But it was at the same time said: 'Under this section the county court might anticipate the revenue collected, and to be collected, for any given year, and contract debts for ordinary current expenses, which would be binding on the county to the extent of the revenue provided for that year, but not in excess of it.'

"It was then anticipated that, though the county court might not issue warrants in excess of the levy for a year's current expenses, and that a creditor might rely upon the fact that his contract was within the amount of revenue levied and provided, and trust to the power of the State to enforce its taxes, still it might happen from some unforeseen cause enough of the estimated amount of revenue might not be collected to pay all the warrants drawn against it in anticipation. Under such circumstances it has never been ruled that such a creditor's warrant was absolutely void and extinguished by the non-payment in the year in which it was drawn. On the contrary, this court has often said in no uncertain terms that it was valid and payable out of any surplus revenue in the hands of the county treasurer that might arise in subsequent years. [Randolph v. Knox County, 114 Mo. 142; Andrew County v. Schell, 135 Mo. l. c. 39; State ex rel. v. Payne, 151 Mo. l. c. 673; Railroad Co. v. Thornton, 152 Mo. 570; State ex rel. v. Allison, 155 Mo. l. c. 344; and on this point, Reynolds v. Norman, 114 Mo. 509.]"

By failure to collect taxes, and other reasons, there are many valid outstanding county warrants in the several counties of the State—nearly $2,000,000 dollars according to reports. By valid outstanding warrants, we mean warrants issued for the current expenses of the year, and warrants which, when issued, were within the anticipated revenue of the year. By the issuance of the bonds involved here, Clark County is seeking to discharge judgments upon warrants of this character. This we say because the validity of the warrants is vouched for by court judgments. If Clark County is successful, the other counties, to use a homely expression, "will follow suit."

As said in State ex rel. v. Johnson, supra, warrants of this character are not invalid because the revenue for the year (as collected) does not meet them, for they may be paid out of the surplus revenues of future years. Of course, there could be no surplus until all

debts of the current year have been provided for or met. Up to this time we have not gone further in the protection of such warrants, so that we have a new idea suggested by the instant case. Such indebtedness should be paid, if any legal and constitutional method can be devised. The question is, has Clark County devised such a method?

II. In the very lucid brief of the Attorney-General for respondent it is said:

"The only manner by which an indebtedness in excess of the income and revenue for any year may be lawfully created is with the assent of two-thirds of the qualified voters voting at an election held for that purpose, as provided by Section 12 of Article X of the Constitution."

*Indebtedness.*

This is a true statement of the situation, if you read into it what kind of indebtedness, as this court has repeatedly said, and we have outlined in the previous paragraph. That is to say, an indebtedness contracted in excess of the anticipated revenue is invalid, but an indebtedness contracted within the anticipated year's revenue is valid, although all of the anticipated revenue may not be collected. It is the revenue which is provided for and should come into the county treasury during the year, that fixes the status (as to validity or invalidity) of the indebtedness contracted during the year, rather than the revenue actually collected and paid out on warrant. We should probably use the term "income and revenue" as distinguished counsel have used, because the receipts of a county may come from several different sources.

So, too, when this court has said (and rightfully so) that the purpose of Sections 11 and 12 of Article X of the Constitution was to place the business of the counties upon a cash basis, we did not mean that debts contracted within the anticipated revenues of the year were invalid because the collected revenues were insufficient to meet all of such debts. Nor did we mean by such expression that warrants issued for such debts

were invalid. because all of them could not be paid out of the revenue actually collected. Nor did we mean that each debt should be met with cash, but we did mean that during the fiscal year the cash would be available to meet the debt if the anticipated revenue was collected and rightfully disbursed. In other words, we have dealt with the matter upon the basis of a year's business, and the term "cash basis" has been used in the sense that the anticipated revenues of the year should at least equal the contracted debts of the year. Such has been our construction of the constitutional system, and as suggested by consul for respondent, if the county desired to contract debts in excess of the year's revenue, resort would have to be made to the people for their consent to the creation of such debt.

But neither the warrants, nor the judgments against Clark County, were debts of that character. The warrants were lawfully issued, so the alternative writ avers, and the judgments were based upon such warrants. To be lawfully issued, they had to be warrants issued for debts created or contracts made within the antici pated revenues of the several years of their issuance. The warrants were legal obligations against the county, and if this court is to know what the general run of mankind knows, and what the history of the State, as well as the departmental records show, there are many valid outstanding warrants (unpaid and without funds with which to pay) in many, if not most, of the counties of the State. As suggested before, they are valid debts and obligations, and should be paid, if a legal method of payment can be devised. This brings us to the crucial question in the case, which question we did not desire to discuss without the side-lights discussed above. In other words, we are not dealing with outlawed warrants, or debts created in violation of law, as this court has construed the law. Has a county, which has thus become legally obligated to pay, and when the annual revenues at the present time is only sufficient to meet its annual legal necessities, no method of paying

these debts, or of refunding them, even at a lower rate of interest? This question we take next.

III.  That the payment of its legal obligations is a legitimate county purpose, there can be no serious question. But of this later. As to how it may be able to pay them, is another story.

The bonds in this case were voted by the two-thirds vote required by Section 12 of Article 10 of the Constitution, but learned counsel for the respondent say that this section only applies to a new indebtedness, and that these bonds are invalid because they do not represent a new indebtedness. As we gather it, astute counsel for relator concede that the indebtedness provided for by this section must be a new indebtedness, but they contend that these bonds represent a new indebtedness, and for that reason are valid.

**Methods of Payment.**

We take it as fundamental that a new indebtedness, within the limits of the provisions of Section 12 of Article 10 of the Constitution, may be created for any lawful county public purpose. If therefore, the discharge of its legal obligations is a lawful county public purpose, then a new debt may be created in the discharge of that public purpose. We are cited to State ex rel. v. City of Neosho, 203 Mo. l. c. 76 and 95, as conclusive of the proposition that a new debt cannot be created in the discharge of an old one. In the dissenting opinion on page 95 of the report of that case, it is said:

"It will be seen that the section just quoted says no city shall *become* indebted. The indebtedness there mentioned refers to new debts or obligations created or contracted for by the city and does not refer to prior valid debts and obligations of the city, except, however, they must be considered and included in the estimation whenever any new or additional indebtedness is proposed to be saddled upon the city. The object of the Constitution is to prevent the city from going into

debt beyond a certain amount and not to extinguish its valid obligations. That being true, it becomes necessary to determine to which of the above classes of indebtedness the $21,000 belongs, to the new or the old."

In the principal opinion at page 82' (203 Mo. l. c. 82) it said:

"The underlying purpose of the constitutional prohibition of an indebtedness beyond five per centum of the taxable wealth of a city was to serve as a limit to taxation as a protection to tax payers. If, therefore, there was no debt contracted for the $21,000, then the citizens of Neosho are accorded the full protection of the Constitution, and the interdiction of Section 12 of Article 10, supra, does not apply."

But neither of the opinions in that case rule that a new debt may not be incurred for the valid public purpose (if such be a valid public purpose) of discharging a prior valid indebtedness. And this is the vital question here.

The first thing to be determined is whether or not the discharge of a valid existing indebtedness is a county public purpose. The second is whether there is (under the facts of this case) a new debt created for such public county purpose. Of these in order.

We hardly deem it to be debatable that the payment of a valid indebtedness by a county, is a county public purpose. Section 3 of Article 10 of the Constitution says that: "Taxes may be levied and collected for public purposes only," and this we have held was the law long prior to its incorporation in the Constitution. [State ex rel. v. St. Louis, 216 Mo. l. c. 90; State ex rel. v. Orear, 210 S. W. l. c. 396.] If, therefore, no taxes can be levied and collected by the county, save for a county public purpose, and the payment of a valid county indebtedness is not a county public purpose, there is no authority on earth by which such valid debt can be discharged, for counties have no way of getting money except through the medium of taxes of some

kind. The Constitution (Sec. 1, Art. 10) places the tax·
ing power for state purposes in the General Assembly,
and in the counties and other municipal corporations
for county and other corporate purposes, but these
purposes are not defined. It is true that this constitu·
tional provision says that counties and other municipal
corporations shall exercise their taxing power "under
authority granted to them by the General Assembly,"
but the very laws which create these municipal corpora-
tions grants them the right (within limitations) to con-
tract and pay valid debts. Whether in express language
or not, it is clear that it could not be otherwise. No
new municipal corporation could start its functions
without such power. The General Assembly in the
very creation (by laws) of these municipal corpora-
tions granted such powers, i. e., to create valid debts
and to pay valid debts. The courts have held such pay-
ment a public and corporate purpose. [National Life
Ins. Co. v. Mead, 48 L. R. A. 785; Stone v. Chicago, 207
Ill. 492.] We conclude therefore that the payment of a
valid existing debt by a county is a county public pur-
pose. And not only so, but that such purpose is within
the meaning of the word "purposes" as used in Sec-
tions 1, 3, 11 and 12 of Article 10 of the Constitution.
The Constitution recognizes the payment of debts as
a public purpose, for in Sec. 20 of Article 10 it is said:

"The moneys arising from any loan, debt or lia-
bility contracted by the State, or any county, city,
town or other municipal corporation, shall be applied
to the purpose for which they were obtained, or to the
repayment of such debt or liability, and not otherwise."

Section 12 of Article 10 is a limitation upon the
exercise of the taxing power, both by the General As-
sembly and the county or other Municipal Corporation.
We say taxing power, because whilst the section speaks
of debt-making, the only way to pay public debts is
through taxes, and one of the great purposes of the
Constitution of 1875 was to limit the taxing power.
[State ex rel. v. Mo. Pac. Ry. Co., 123 Mo. l. c. 78.]

When you limit the debt-making rights or powers, you limit the taxing power, and *vice versa*. But with all this in view, we find in this Section 12 of Article 10 authority for counties to become indebted up to a given amount, by procuring the assent of two-thirds of the voters. This indebtedness, so to be assumed, is not limited to any one particular purpose, but covers any county public purpose. And if the paying of a · valid debt is a county public purpose, it means that, as well as other such purposes. In other words, it means that by such assent the county can create an obligation, even though the purpose of that obligation is to procure funds with which to pay off and discharge a previous valid debt.

The learned Attorney-General urges that this section has reference to new obligations, and for the purpose of this case we may grant it. In this case the county has issued its bonds to be sold upon the general market and with the funds so procured it expects to discharge these judgments. These bonds, when sold to A, B, C and others of the general public, are new debts and obligations, notwithstanding the fact that the cash received may be used in the discharge of the previous valid obligations of the county. If I owe John Jones $1000, evidenced by my note, I am indebted to him. If when that note reaches maturity (or even before maturity) I go to John Smith and give him my note for $1000, with the purpose of taking the $1000 and paying Jones, I have created a new debt or obligation, although my purpose was to discharge an old debt. The obligation or debt in the one instance was to Jones, but in the other it is to Smith. They are not the same obligations or debts, and the latter is a new debt or obligation. If I actually pay the Jones debt my liabilities will then be the same as before, but if not, they are doubled. But in neither event can it be said that I have created no new debts. So in the case at bar, when these bonds are sold they create a new debt or obligation against the county, although the purpose may be to use the pro-

ceeds to discharge an old debt. The bonds are not payable to the same parties as are the judgments. The two transactions are as separate and distinct as the Jones and Smith matters, supra.

The bonds therefore constitute a new debt. This is not a case where the bonds are to be given to the old creditors in exchange for their obligations, and we need not discuss the question from that angle. Whilst we have no direct construction of the point by our courts, we do have a legislative construction. Section 9356, Revised Statutes 1909, authorizes cities of the fourth class to vote bonds to pay off existing judgments. Section 9357 following, thus reads:

"No such bonds shall be issued in such a manner as to increase the indebtedness of the said city, but such bonds shall be sold as directed by the board of aldermen of such city, and the proceeds thereof shall be applied only to the payment and discharge of the judgment and decrees of any court for the payment of which the same may be issued, and such bonds so sold shall be delivered at the same time that the judgment and decree aforesaid shall be paid and discharged."

This section forbids the issuance of such bonds in a way to increase the indebtedness. To that end it provides that the bonds shall be sold, but not delivered until the judgments are paid and discharged. The issuance and delivery of the bonds and the release of the judgments must be at the same time. The legislative idea was that unless so done the debt of the city would be increased by the new debt created by the bonds. The case law is divided upon the question, but we believe the reason of the thing lies with the idea that bonds issued and sold as these bonds are to be sold creates a new, and for a time at least, and additional indebtedness.

The pioneer in constitutional provisions, such as we have in our Section 12 of Art. 10, is the State of Iowa, in 1857, followed by Illinois and West Virginia, prior to our Constitution of 1875. Ours evidently came

from one or the other of those states.  Our court in
Barnard & Co. v. Knox County, 105 Mo. 382, has ap-
proved of the rulings in Iowa as to this provision of
the Constitution.  In Doon Township v. Cummins, 142 U.
S. l. c. 370, it is said:

"The Constitution of Iowa, Art. 11, Sec. 3, ordains
as follows:  'No county, or other political or municipal
corporation, shall be allowed to become indebted in any
manner, or for any purpose, to an amount in the aggre-
gate exceeding five per centum on the value of the taxa-
ble property within such county or corporation—to be
ascertained by the last state and county tax lists, previ-
ous to the incurring of such indebtedness.'  The scope
and meaning of this provision of the fundamental and
paramount law of the State are clear and unmistakable.
No municipal corporation 'shall be allowed' to contract
debts beyond the constitutional limit.  When that limit has
been reached, no debt can be contracted 'in any manner,
or for any purpose.'  The limit of the aggregate debt of
the municipality is fixed at five per cent of the value of
the taxable property within it;  and that value is to be
ascertained by the last state and county tax lists,' which
are public records, open to all, and of the contents of
which all are bound to take notice.  The prohibition is
addressed to the Legislature, as well as to all municipal
boards and officers, and to the people, and forbids any
and all of them to create, or to give binding force to, any
debts of the corporation in excess of the limit prescribed.
The prohibition extending to debts contracted 'in any
manner, or for any purpose,' it matters not whether
they are in every sense new debts, or are debts con-
tracted for the purpose of paying old ones, so long as
the aggregate of all debts, old and new, outstanding at
one time, and on which the corporation is liable to be
sued, exceeds the constitutional limit.  The power of the
Legislature in this respect being restricted and controlled
by the Constitution, any statute which purports to au-
thorize a municipal corporation to contract debts in any
manner or for any purpose whatever in excess of that

45—280 Mo.

limit is to that extent unconstitutional and void. By the terms of the statute of Iowa of 1880, chapter 132, under which the bonds in question were issued, any independent school district or district township, having a bonded indebtedness outstanding, is authorized to issue negotiable bonds for the purpose of funding that indebtedness; and 'the treasurer of such district is hereby authorized to sell the bonds provided for in this act at not less than their par value, and apply the proceeds thereof to the payment of the outstanding bonded indebtedness of the district, or he may exchange such bonds for outstanding bonds, par for par.' There is a wide difference in the two alternatives which this statute undertakes to authorize. The second alternative, of exchanging bonds issued under the statute for outstanding bonds, by which the new bonds, as soon as issued to the holders of the old ones, would be a substitute for and an extinguishment of them, so that the aggregate outstanding indebtedness of the corporation would not be increased, might be consistent with the Constitution. But under the first alternative, by which the treasurer is authorized to sell the new bonds and to apply the proceeds of the sale to the payment of the outstanding ones, it is evident that if (as in the case at bar) new bonds are issued without a cancellation or surrender of the old ones, the aggregate debt outstanding, and on which the corporation is liable to be sued, is at once and necessarily increased, and, if new bonds equal in amount to the old ones are so issued at one time, is doubled; and that it will remain at the increased amount until the proceeds of the new bonds are applied to the payment of the old ones, or until some of the obligations are otherwise discharged. It is true that if the proceeds of the sale are used by the municipal officers, as directed by the statute, in paying off the old debt, the aggregate indebtedness will ultimately be reduced to the former limit. But it is none the less true, that it has been increased in the interval; and that unless those officers do their duty, the increase will be permanent. It would be inconsistent alike with the words, and with the object, of the constitutional pro-

vision, framed to protect municipal corporations from being loaded with debt beyond a certain limit, to make their liability to be charged with debts contracted beyond that limit depend solely upon the discretion or the honesty of their officers.''

You can't have an increase or doubling of a debt, without a new obligation or debt. As in the Cummings case, supra, so in the case at bar, there is a period of time ·when there are two separate and distinct debts, i. e. (1) the old judgment debts, and (2) the new bond debt.

In Reynolds v. Lyon County, 121 Iowa, l. c. 737, the Supreme Court of that State again had the matter before it. After quoting with approval from the U. S. Supreme Court, what we quoted above, the Iowa court thus proceeds:

''In the dissenting opinion this construction was denounced as purely technical, as the object of the statute was, not to create a new or increase the old indebtedness, but merely to change its form, and reduce the interest rate. The difficulty in this suggestion *is that a new debt* is for the time being created, and one day's continuation of it in addition to that evidenced by the old bonds is as much within the condemnation of the letter and spirit of the Constitution as that of a year. It won't do to say that officers may be relied upon to use the proceeds derived from the sale of bonds to wipe out existing obligations. In that case these were not so applied. The very object of this article of the Constitution is to protect the interests of the people against their own improvidence and extravagance. If such bonds are not within the prohibition, it would be within the power of dishonest officials by indirection to circumvent the fundamental law, and through diversion of the proceeds of new bonds saddle both them and the outstanding debts as burdens on the people.''

The new bonds could not fall within the purview of the constitutional inhibition, save and except, they constitute a new debt. The Iowa court then discusses the cases pro and con, but we need not reiterate. The cases serve to illustrate the difference between cases like the

one we have at bar, and cases where the new bonds are to be exchanged for the old bonds, or where the new bonds are only to be issued upon the release of the judgments, as provided for by our statute, Section 9357, supra.

But aside from all this, the very reason of the thing bespeaks a new indebtedness. The bonds were to be sold to the public, not to the judgment creditors. The obligations were to third parties, and not to the same parties. This makes a new debt, and we so rule.

Nor do we think that this ruling will thwart the constitutional idea of counties doing business on a cash basis, any more than it has been thwarted by our previous cases. The doctrine that all contracts in excess of the anticipated year's revenue are void is the corner stone of what our court fixes as the cash basis idea. That corner stone remains, under our views herein.

IV. As a last vital contention the learned counsel for respondent say that there was no law authorizing the election to be held, and therefore the bonds are invalid. It is true that this election was held prior to the Act of the General Assembly, approved May 21, 1919 (Laws of 1919, p. 178), which specifically provides for such bond election, but it does not necessarily follow from this that the election was not without authority of law. Legislative acts of this kind are sometimes passed to clear up a doubt, rather than to confer original authority. In other words a question may appear to be mooted, and to dispel all doubts legislation is passed. We think that such was the purpose of this act, and it thereby loses its force as a legislative construction of the existing *status* of the law.

Going then to the situation prior to this legislative expression, how stands this bond election? Under the law the payment of a valid debt is a county public purpose, and this by the legislative authority in the creation of the municipal sub-divisions, known as counties. Under Section 12 of Article 10 of the Constitution counties have the power, by elections held for that purpose, to

create debts for county public purposes. Note the authority is by elections. The requisite vote is prescribed, but the details of the election are not otherwise prescribed. Whilst Section 12 of Article 10 is a clear limitation on the power to create debts, and the power to increase taxes, it is likewise a grant of power to do both in a certain way and within a prescribed limit. There is no question of the limit in this case, because the debt is within the limit. The certain way is fixed, and that is by a vote of the people. The grant or right to determine the question by a vote of the people is fixed by this constitutional provision. Even the limitations in this section of the Constitution are of two classes. First, we have those that must fall within the limitation of "five per centum on the value of the taxable property therein," and, secondly, we have those where the limit is higher, as stated in the first proviso. This proviso refers to certain specific matters, i. e. court-house, jail and rock-roads. These two classes should not be overlooked. The first embraces all usual county purposes, the other is for specific county purposes. The payment of legal debts falls within the first, and whilst both require the vote of the people, the latter, being a call for much heavier taxation, have been looked after by special legislation as to the elections for such purposes. But this does not mean that as to the first class named, the Constitution itself is not sufficient authority for the election. In State ex rel. v. M. K. & T. Ry. Co., 164 Mo. l. c. 213, it is said:

"The power being conferred to hold an election and no means provided therefor, carries with it as an inevitable and indubitable incident the usual and customary means to put into effect the power thus conferred."

Whilst Section 12, Article 10, inhibits counties from contracting debts "exceeding in any year the income and revenue provided for such year" yet in addition to this inhibition is a grant of authority to contract in excess of the yearly income and revenue provided "the assent of two-thirds of the voters thereof voting at an election to be held for that purpose." If this is not a grant of

the authority, there is no such authority. Without this grant the Legislature would be powerless, and no law passed by the Legislature could give it. This, because of the broad and positive restriction in the first paragraph, so that, for the ordinary and usual county public purposes, the real grant to hold an election comes from the Constitution. And where no machinery has been provided for such an election, it is sufficient if there is used the ordinary and usual machinery provided for obtaining the expression of the votes upon the question. In this case the Legislature in 1919 has specifically provided the method, which is not materially different from the one used here, but if our views of the situation are correct, there would be a useless expenditure of money to require a new vote under the Act of 1919. We think there was authority for the election without this act and that the act was passed to make assurance doubly sure.

Other questions raised do not require note in view of what we have said. It follows that our peremptory writ of mandamus should go, and it is so ordered. All concur, except *Goode, J.,* who dissents in opinion filed; *Woodson, J.,* absent.

GOODE, J., (dissenting.)—This case is presented for decision on a motion of Clark County, the relator, that the court award its peremptory writ of mandamus, commanding respondent to register the bonds in question, notwithstanding the return made by respondent to the alternative writ. It is, therefore, a motion for judgment on the pleadings, and the pertinent facts are to be gathered from the pleadings.

The averments of the petition and return agree that default judgments to the amount of more than one hundred thousand dollars were recovered against Clark County in April, 1916, on warrants issued in prior years to pay the ordinary expenses of the county. The return of respondent alleges these warrants were issued in excess of the income and revenue provided for the respective years, and without the assent of two-thirds of the qualified voters of the county voting at an election held

for the purpose of authorizing their issue. After the
warrants had passed into judgments, of the county court
called a special election at the usual voting places, to
authorize the incurring of an indebtedness in the sum
of the judgments ($103,944.04) and to evidence the in-
debtedness by the issue and sale of bonds, of which the
proceeds should be used to pay the judgments; also to
provide an annual tax to pay the interest on the pro-
posed debt as it fell due, and create a sinking fund to
pay the principal in twenty years. The forms of the
ballots are shown in the majority opinion, and from
them, as well as from the call for the election, it is clear
the proceeds of the bonds could not be used by the coun-
ty officials without a breach of official duty, except to
pay the judgments. Pursuant to the supposed authority
therein obtained from the voters, the county court en-
tered an order for the levy and collection of an annual
tax sufficient to pay the interest on them for the years
1917 to 1935, inclusive, and create a sinking fund to pay
the principal at the end of twenty years. The amounts
of the special taxes levied for said years on account of
the principal and interest, fluctuate from something over
five thousand dollars to more than eleven thousand dol-
lars, and it is agreed in the pleadings of the parties that
said levies for each of the years from 1917 to 1919 in-
clusive are in addition to the maximum levy of forty
cents on the hundred dollars, which the county may make
under Section 11, Article X, of the State Constitution,
and that for the years to come, until 1935, said levy for
the principal and interest on the proposed bonds must
be in addition to said maximum levy, because the county
will require the revenue to be obtained by the maximum
levy for its ordinary expenses. The court in ordering
the special election expressly found as follows:

"That the county needs and must have to meet its
ordinary current expenses, all of its revenue and income
produced by a levy of forty cents on the one hundred
dollars valuation of taxable property in the county and
therefore cannot spare any part thereof to apply to the
payment of any part of any of said judgments,"

Respondent, as Auditor of the State, refused to register the bonds, assigning, among other reasons for his refusal, the following: That the warrants on which the judgments were based, were issued, as heretofore stated, in excess of the income and revenue provided for the respective years when they were issued; that the debts evidenced by said warrants so issued in excess of the income and revenue of the respective years and now represented by the several judgments aforesaid, were not incurred with the assent of two-thirds of the voters of the county at an election held for the purpose of authorizing such debts; that the judgments were obtained by default, and did not represent any indebtedness incurred with the assent of two thirds of the voters; that the levy of taxes for each of the years to pay the principal and interest on the proposed bonds is in excess of the maximum levy permitted by said Section 11, unconstitutional, void and uncollectible; therefore respondent should not be made to register the bonds and certify on them that all the conditions of the law have been complied with.

The gist of this defense is that the issue of bonds is not a "becoming indebted" by the county within the meaning of Section 12, Article 10, of the Constitution, which restricts public and quasi-public corporations from becoming indebted in any year to an amount in excess of the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose. In other words, that this bond issue is, in effect, the old debts evidenced by the warrants and then by the judgments, and not a new indebtedness; that even granting the proposed issue of bonds is a new debt and falls within the contemplation of said Section 12, it is invalid for the reason that said section, in so far as relates to the incurring of an indebtedness with the assent of two-thirds of the voters of a public corporation, is not self-enforcing, but looks to the granting of statutory authority to incur a particular debt, and no statute has been enacted to authorize an indebtedness of the kind in question or

to provide for an election to take the sense of the voters.

The averments in the return of the Auditor that the warrants were originally issued in excess of the income and revenue provided for the respective years, were stricken out on motion and have no bearing in the consideration of the case.

Among the questions raised by the defenses set up by respondent, are these: First, can a county which has fallen into debt by issuing warrants on its treasury up to the full amount of the income and revenue anticipated and, in a sense, provided for the year, which warrants have passed into judgment, issue bonds to pay the judgments, if two-thirds of the voters of the county, voting at an election held for the purpose, assent to the bond issue? Second, can it do so in the absence of an empowering statute? The portion of Section 12 which is pertinent is the first clause of the first paragraph and reads as follows:

"No county, city, town, township, school district or other political corporation or subdivision of the State shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose." [Sec. 12, Art. 10, Const.]

I. The proposed bonds would be invalid in my judgment for want of power in the county to issue them, even if it be conceded they would be such an indebtedness as is contemplated by Section 12, Article 10, of the Constitution. No authority existed by legislative grant, nor had any method been provided to ascertain the will of the voters of the county on the matter. Said section of the Constitution is not self-enforcing in the sense of being a direct grant of power to counties to incur debts, but leaves to the Legislature the right to do that when deemed advisable and to provide a method for taking the sense of the voters. The constitutional provision is negative in

*Limited Powers of Counties.*

form, and a restriction on the power of public corporations to incur debts and on the authority of the Legislature to authorize such corporations to become indebted. Constitutional limitations of this character are not construed as grants of authority) to political subdivisions of a state. [Federal Ry. Co. v. Pittsburg, 75 Atl. (Pa.) 662; Abbott on Pub. Secur. sec. 143.] In every instance that I know of, where debts created under Section 12 have been upheld, a, statute authorized the debt and provided for an election. We have a statute to empower counties, etc., to refund their bonds and fund judgments against them at lower interest; but this statute is not in enforcement of said Section 12, nor applicable to the bonds in question, for the authority given is to fund or refund without a vote of the people, except in the case of bonds issued in aid of a railroad, when a majority vote is required. [R. S. 1909, sec. 1249.] Besides, the indebtedness authorized to be refunded, would look to the same resources of the county for payment as the original debt, and not to additional taxation as in the case of a debt created under Section 12. Section 1250 relates at most, to refunding *bonds* only, and by a majority vote. If counties possess inherent power to borrow money, which is what the proposed bond issue contemplates, the quoted clause of Section 12 operates as a constitutional limitation of the power; if they have no such inherent power and can only borrow pursuant to a grant of power by the Legislature, the clause is a constitutional limitation of the authority of the Legislature to make the grant—a statement of the extent to which the Legislature may authorize the county to go. The rule is that counties are quasi-public corporations and, to use the language of an opinion of this court, have "just such powers and only such as the State, by its lawmaking power, confers upon them." [Jefferson Co. v. St. Louis Co., 113 Mo. 619, 625.] That a county has no implied power to borrow money has been often held in other jurisdictions and is the accepted doctrine. [Abbott, Pub. Secur., sec. 57, p. 103.] The question is discussed at length and the ad-

judications listed in the notes of the cited and following sections of that treatise, which says, concerning public corporations in general, that "some of the earlier cases held that an implied power existed to incur indebtedness through the borrowing of money, but the later authorities deny almost universally this doctrine." Another treatise, in speaking of counties, says: "It is very generally held that, in the absence of a statute, a county has no power to borrow money, and this though the purpose may be to apply the money to a public use." [7 Am. & Eng. Ency. Law (2 Ed.), p. 932.] And again we find the rule thus stated, supported by a long array of decisions: "The weight of authority from the adjudged cases is that counties, being the creatures of statute, have no powers except those granted by statute, and that the power to borrow money will not be implied but must be expressly granted to authorize its exercise." [15 Corp. Jur. sec. 277, p. 573.] The reason for this doctrine is that public corporations are invested with the power to raise by taxation the money needed to enable them to perform their functions, and the express grant of the right to raise money in that mode excludes the implication of the right to raise it by borrowing. [Ketchum v. Buffalo, 14 N. Y. 356; The Mayor v. Ray, 19 Wall. (86 U. S.) 468, 475.] In the present case, not only is money to be borrowed, but the negotiable securities of the county are to be issued as evidences of the debt, and the power to do this does not belong to a county unless expressly granted by the legislative authority of the State. A text-writer already quoted says, in discussing the power in this matter of bodies politic in general: "The rule now established by an overwhelming weight of authority is that the power of a public corporation to issue negotiable securities must be expressly given and can never be implied. There are some modifications of the doctrine which will be noted later." [Abbott, Pub. Secur. sec. 84, p. 167.] The subject was dealt with by the Supreme Court of the United States in Police Jury v. Britton, 15 Wall. (U. S.) 566. See, too, cases cited in Abbott, Public Securities, pp. 173, et seq., including

Merrill v. Monticello, 138 U. S. 673; C. B. & Q. Ry. Co. v. Otoe County, 83 U. S. 667; City of Brenham v. Bank, 144 U. S. 173; Ashuelot Nat. Bank v. School Dist., 56 Fed. 197; Claiborne Co. v. Brooks, 111 U. S. 400; Watson v. City of Huron, 97 Fed. 449.] The same doctrine was plainly implied, although not expressly declared, by this court in Evans v. McFarland, 186 Mo. 703, 724. The modifications of the general rule, regarding the right of a public corporation to issue negotiable securities, referred to by Abbott in the quoted excerpt, are commented on by him later, at page 180, as follows:

"The implied power to issue negotiable securities has been claimed under the following circumstances: (1) Where there has been the grant of an express power to borrow money or to contract indebtedness, and: (2) where the power has been claimed to arise under the grant of express authority to subscribe for the stock of a railroad company; to construct public buildings, to improve highways or make some necessary improvements or in general to execute some necessary and proper power directly given or impliedly existing.

"The early cases in the Supreme Court of the United States held almost without exception that where authority was given to borrow money or to contract indebtedness for any public purpose, such a grant conferred the power to issue negotiable securities as the usual and ordinary way of accomplishing the objects of the grant. Corporate bonds bearing interest and negotiable by delivery being the usual and appropriate securities for engaging municipal credit.

"These decisions have all been expressly or substantially overruled by later cases in the Supreme Court of the United States, notably those of Merrill v. Monticello, 138 U. S. 678, and City of Brenham v. German-American Bank, 144 U. S. 173."

In the case in hand we are called on to imply not only a power in the relator county, to borrow money, but, having made that implication, to imply further a power to issue negotiable bonds for the loan, a ruling for which, so far as I know, no precedent exists. In

National Life Ins. Co., v. Mead, 13 S. D. 37, and Stone v. Chicago, 207 Ill. 492, cited by relator, and wherein municipal bonds to pay the floating indebtedness of the city were upheld, there was express statutory authority for the issue of bonds. Such authority was given, or attempted to be, by our Legislature in 1919, but that was prior to the election for the issue of the bonds in controversy. [Laws 1919, p. 179.] And I will observe here in reference to those cases what might be said more properly under the second paragraph of this opinion, that neither of them involved the effect of constitutional limitations like ours, upon the right of a county to borrow money to pay warrants issued for past expenditures, but involved only the meaning of a statute authorizing the borrowing of money. The same is true of the cases cited in the foregoing cases. [Morris v. Taylor, 31 Ore. 62;   Huron v. Second Ward Sav. Bank, 86 Fed. 272;   Portland Sav. Bank v. Evansville, 25 Fed. 389.]

II. Will the county, by the proposed issue of bonds, become indebted within the meaning of Section 12 of Article 10 of the Constitution? We will be helped in the attempt to answer this inquiry by looking into the prior decisions of the court upon the section.

*Indebtedness.* Section 11 is a limitation on the rates of taxation that may be levied for county, city, town or school purposes; whereas Section 12 is a limitation on the power of a county, city, town, school district or other public corporation, to incur debts. If a public corporation becomes indebted under Section 12, the debt must be paid by taxation of one kind or another, and mainly by direct levies, and inasmuch as Section 11 declares its restrictions as to rates of taxation shall "apply to taxes of every kind and description, whether general or special, except taxes to pay valid indebtedness now existing, or bonds which may be issued in renewal of such indebtedness," it was first held that any public debt created in the mode provided in Section 12 was subject to the limitations on rates imposed by Section 11; that

is to say, the debt would be; unconstitutional notwith-
standing it was authorized by the requisite vote of the
people, if the annual tax levied to pay the interest and
create a sinking fund, when added to the tax levied to
pay the current expenses of the county or other public
or quasi-public corporation for the year, exceeded the
maximum rate which might be levied by the particular
public corporation under Section 11. [State ex rel.
Robinson v. Town of Columbia, 111 Mo. 365.] This con-
struction made it impossible for any such corporation to
exceed the maximum rates provided in Section 11,
either to pay ordinary expenses, like the salaries of
officers, cost of caring for paupers, etc., or extraordinary
expenses, such as the interest and principal of a debt
created to provide for a; water or light supply, public
sewers, etc., or to pay both .classes of expense. This
construction was later overruled in favor of the view
that the rate of taxation needed to pay the .interest on
and create a sinking fund to discharge the principal of
a debt incurred as provided in Section 12, might be
levied in addition to the maximum rate; prescribed in
Section 11; a construction which has since prevailed. .
[Lamar Co. v. Lamar, 128 Mo. 188; Id. 140 Mo. 145;
Water Co. v. City of Aurora, 129 Mo. 540; State ex
rel. Miller v. Ry. Co., 164 Mo. 208; City of Lexington
ex rel. v. Bank, 165 Mo. 671; State ex rel. v. Neosho,
203 Mo. 40.] The point arises whether the court, in that
departure from the first construction, meant to say
Section 12 should operate independently of Section 11,
not only as regards incurring debts for unusual expendi-
tures, but for those of the annual routine as well; that
is whether under Section 12 the people of a county might
. reject altogether the cash system of Section 11 and vote
debts for routine expenses up to five per cent. of the
value of the taxable property of the county. While the
court in none of these cases had occasion to determine
generally the purpose for which an indebtedness might
be incurred under Section 12, in all of them the debts
were created to provide for some kind of public serv-
ice. The decisions in which this court sanctioned a tax

levy in excess of the maximum prescribed in Section 11, when the tax was to pay a debt incurred under Section 12, assumed that the ordinary annual expenditures of the municipality are to be taken care of by taxes raised within the limits of Section 11, and the excess levy was permitted, when voted according to Section 12, on the theory that expenditures for other than ordinary purposes might become necessary, and the revenue raised within the rates prescribed in Section 11 be insufficient to meet them without entrenching on the funds required to defray the usual running expenses of the municipality. As stated, in every case so far decided, the unusual expenditure was for a public utility, and the court declared that the makers of the Constitution could not have intended, either that municipalities should be denied the benefits of public utilities, or that they must be paid for out of the rates provided in Section 11 to the deprivation of means to pay the ordinary expenses of the particular public corporation. The minority opinion in the Lamar case held that a municipality had two alternatives; i. e., to do without a desired public service or pay for it out of taxes raised within the limits of Section 11. The majority opinion held there was a third possible construction, "that is to say, may it not have been intended that the 'annual tax' authorized to be imposed, upon a vote, under Section 12, should be levied and collected (within the limitations of that section), in addition *to the annual rates for local purposes* permitted (without any vote) by Section 11?" And again, treating of the two sections, the opinion said:

"One object was to limit the rates of taxation for raising the annual revenue *required for local purposes;* the other to limit the power to incur indebtedness beyond the annual income and revenue provided for any one year.

"Section 11 deals with rates of taxation for annual revenue which may be applied by the local authorities to meet *'the ordinary and current expenses'* of the local government. [Book v. Earl, 87 Mo. 252; Compare Const. 1875, art. 9, sec. 19.]"

And again:

"It seems first of all necessary that the funds permitted by Section 11 to be raised for the legitimate *ordinary purposes of the government,* should be preserved from invasion or diminution by any tax levied under Section 12. Experience demonstrates that the limitations of Section 11 are narrow enough even as applied to the *general needs of the municipalities which that section governs.* The provisions of Section 12 were not designed to cut down the annual revenue *intended for the ordinary wants of the local governments.* But such a cutting down would be imperative, if the first alternative ruling, already discussed, were adopted." [128 Mo. l. c. 216, 220.] (All italics mine).

These expressions of this court when it abandoned the view that a tax levied to pay an indebtedness incurred under Section 12, must not transcend the rate limit provided in Section 11, plainly imply, and, in effect, say, that the ordinary or local expenses of a county or municipality must be taken care of within the limits of Section 11; and that Section 12 authorizes an indebtedness to be incurred, not to take care of those expenses, but of new debts created for other purposes than to carry along the ordinary affairs of the county or municipality. That Section 11 was intended to limit the power of a public corporation to tax for usual and current purposes, was declared in Brooks v. Schultz, 178 Mo. 222, 226, and in Evans v. McFarland, 186 Mo. 703, 725, et seq., where the court, in adverting to the decision in Lamar Co. v. Lamar, supra, said that in the latter case "this court, brushing away all contrary expositions, held, in effect, that Section 11, Article 10, of the Constitution contemplated an annual rate of taxation for municipal purposes to be levied without a vote, of 50 cents on $100 of valuation, to be devoted under the cash system of the Constitution, to affording the municipality *a means of subsistence,* and that the tax contemplated by Section 12 of Article 10 of the Constitution is not a fixed charge on the revenues derived by said fifty-cent levy, but is in addition thereto." The opinions on this

State ex rel. Clark County v. Hackmann.

subject show the thought has never occurred to this court heretofore, that a debt might be created under Section 12, in order to discharge a debt previously incurred for the ordinary expenses of a city or county; and that, on the contrary, it was always in the minds of the judges, both those who agreed to the later construction of the Constitution and those who adhered to the earlier one, that such a debt could be contracted only for some other purpose than taking care of delinquent warrants issued for current expenses of prior years, or judgments on them. And, as said before, so far no such indebtedness has been sanctioned except for some public service. I do not say cases cannot arise in which it properly might be created for another purpose; but only say that in my opinion it cannot, under the Constitution, be contracted to discharge warrants issued for the usual annual expenses, or judgments on them, when the warrants are not paid because of a deficiency of the expected income from taxes and other sources of revenue.

It is true this court has held a county may anticipate the revenues provided for a year, that warrants may be drawn within the amount of the provided revenue, and, if warrants are not paid because of disappointment in the amount of taxes received, they are not void, but may be paid out of any surplus remaining in the treasury in a succeeding year after the ordinary expenses of such year have been defrayed; but the latter must be paid first; a clear indication that every year must bear its own burdens before it can take on those of a prior year, thereby preventing debts from accumulating. [Book v. Earl, 87 Mo. 246; Trask v. Livingston Co., 210 Mo. 582, 594.] This power of anticipation of the current revenues appears to have been confined by the Supreme Court of Iowa, in construing a constitutional provision like ours, to such revenues as were "absolutely certain to be received by the collection of taxes." [French v. City of Burlington, 42 Iowa, 614.] And in Book v. Earl, 87 Mo. 252, the court indicated the extent of the power to anticipate and what was meant by the

46—280 Mo.

"revenues provided," by saying the purpose of the Constitution was to limit the "expenditures in any given year to the amount of revenue which such tax would bring into the treasury for that year; . . . that the county court might anticipate the revenue collected and to be collected for any given year, and contract debts for ordinary current expenses, which would be binding on the county to the extent of the revenues provided for that year, but not in excess of it." It is doubtful whether a sound construction of the Constitution will allow a county court to issue warrants up to the full amount of the income the county will collect if all the taxes levied are paid, in view of the well-known fact that receipt in full of levies rarely is realized. Be that as it may, there is an essential difference in principle between holding that a warrant drawn against the revenues provided for a year may be paid out of the surplus revenues of a succeeding year, and holding that an indebtedness may be created and bonds issued to take up an aggregate of debts incurred for ordinary expenses. The principal purpose of the sections of the Constitution with which we are dealing, as has been declared repeatedly, is to prevent the accumulation of public debts—to establish the cash system and abolish the credit system in public affairs, and to restrain improvident management. It may be argued with some consistency that if a county has issued warrants which it is unable to pay because it was disappointed in its collection of taxes and other anticipated income, nevertheless it may discharge those warrants out of the surplus revenues of a later year; for this policy does not tend to pile up public debts, but tends, rather, to induce economy of administration and thereby the discharge of debts which arise through failure to collect provided revenues in full. The contrary result will happen if you say a county need not be confined to a surplus yielded by economical methods of business, higher assessments, or, perchance, a growth of the taxable wealth of a county in paying off delinquent current expenses, but

may vote and issue bonds for the purpose. This doctrine tends to frustrate the policy of the Constitution to put public affairs on a cash basis and prevent the accumulation of debt. The admitted fact in the present case that the counties of the State owe nearly two million dollars for delinquent current expenses, together with the suggestion that if Clark County succeeds in the present attempt to fund its said debt, other counties likely will follow, shows what will be the result if Section 12 is construed to permit the funding. With two million dollars of county debts incurred for ordinary expenses, to say nothing of those of cities, towns, etc., put into the form of interest-bearing securities, what will be left of the "cash system" in public business, so often asserted to have been the object of the Constitution? To permit a debt to be voted in advance to pay current expenditures, because a deficiency of revenue is certain to occur in consequence of uncollected taxes (though such debt would be a new one and therefore more within the letter of Section 12) would enable a county to abolish totally the cash system of public business, intended to be put into effect by the Constitution; and the same mischief must follow, if a debt may be voted to make good a deficiency which has accrued from anticipating the revenues of previous years. In either event the maximum rates prescribed in Section 11 could be nullified. The foregoing considerations make it patent to my mind that heretofore the discharge of warrants issued or judgments rendered on account of current expenditures, was not regarded by this court as a purpose for which a county may become indebted under Section 12, and that to so hold would be an unsound construction of the Constitution.

The weight of authority supports the proposition that the proposed bonds, issued to fund prior contractual obligations, would not constitute becoming indebted within the meaning of Section 12; in other words, would not be the creation of a new indebtedness, when, the transaction is regarded from the standpoint of what

are the elements of a new debt. In one sense the bonds may be regarded as a new debt, but not in the constitutional sense. Said section has reference to becoming indebted in a substantial sense and so as to increase the financial obligations of the county or city. That bonds issued by a public corporation to fund a floating obligation or to refund old bonds, do not constitute a new indebtedness in the meaning of such constitutional limitations, is the doctrine accepted by the standard textwriters upon 'the reasoning and decisions of the courts. [Abbott, Public Securities, sec. 209, p. 431; 5 McQuillin, Mun. Corp. sec. 2270, p. 4798.] The author first cited said:

"The objection that through the issue of renewal or refunding bonds a new debt is created, has been repeatedly decided by the courts as not well taken, for the reason that the proceeds of such bonds are used, not for the purpose of adding to the indebtedness or the obligations of the corporation, but of paying outstanding ones, which, immediately upon the exchange or payment, become cancelled and extinguished and incapable of enforcement as corporate obligations, the only legal indebtedness existing against the public corporation as a result of the process being the new refunding or renewal bonds. Bonds issued to fund a valid indebtedness neither create any debt nor increase the debt, but merely change the form of the indebtedness." [Abbott, l. c. 431, 432.]

It is true the Supreme Court of the United States, in an opinion dissented from by three of the judges and decided the other way on the circuit (Cummins v. Township of Doon, 42 Fed. 644), took a distinction between refunding bonds issued to be exchanged for outstanding bonds, and those issued to be sold and the proceeds devoted to paying the prior bonds, holding that in the former case an indebtedness was not created within the meaning of such a constitutional provision as Section 12; whereas, in the latter case it was; because, in the interval between the issue of new bonds and the application of the proceeds to pay the old ones,

there was an increase of the indebtedness of the public corporation; a doctrine that hinders needlessly the power of a municipality to refund its debts. It is said in a treatise cited above, that the decision has been so distinguished and criticised in respect of the point in question, that its authority has been much modified, if not entirely destroyed. [Abbott, Pub. Secur., p. 435.] The case has not been approved generally, one court remarking that the distinction taken "seems to be more nice than real, and in view of the vigorous dissent that was accorded the opinion, we may be permitted to doubt whether it ever will be made again." [City of Huron v. Sav. Bank, 86 Fed. 278.] In another case the decision was declared to be the source of all the trouble in dealing with the question in hand, and the opinion declared the courts of the states had almost uniformly refused to follow it and instead had accepted the minority opinion. [Veatch v. City of Moscow, 18 Idaho, 313.]

In the New York Court of Appeals the point was presented of whether or not bonds, issued under a refunding act, which might either be used to discharge a prior issue or sold and the proceeds used to cancel the prior ones, were valid, in view of a statutory provision against the city borrowing money. The new bonds were held not to amount to a borrowing and increasing of the debt of the city within the statute, the court saying that if sold for the purpose of raising money to pay old bonds, the effect was not different from what it would have been if they had been exchanged. The suit was one for specific performance to compel the purchaser of the new bonds to take them, he defending on the ground that they were invalid. [City of Poughkeepsie v. Quintard, 136 N. Y. 275.]

The Supreme Court of Oklahoma, in passing upon the legality of bonds issued to take up warrants and other forms of floating debts of that State and of the Territory of Oklahoma, had occasion to decide whether the new bonds created a new debt, for if they did, they

were void, as the question had not been submitted to a popular vote. The opinion said: "It has been frequently held that where bonds have been issued for the express purpose of liquidating an outstanding indebtedness, such bonds neither created nor increased the public debt, but simply changed its form." [In re Mennefee, State Treas., 22 Okla. 365, 374.]

The point arose for decision in Indiana, as to the validity of a proposed bond issue, and that, too, under a constitutional provision which prohibited public corporations to "become indebted in any manner or for any purpose to an amount in the aggregate exceeding two per cent on the value of the taxable property within such corporation, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness." The opinion said the "issuing of new bonds to provide, at their par value, for the payment of an old debt, or the substitution of new evidence of a pre-existing debt, is not in any legal or proper sense the creation of a new indebtedness." [Powell v. City of Madison, 107 Ind. 106.]

In dealing with the proposition, the Supreme Court of California said that "merely to fund or refund an existing debt is not to 'incur an indebtedness or liability.' A bond is not an indebtedness or liability, it is only evidence or representative of an indebtedness, and a mere change in the form of the evidence of indebtedness is not to create a new indebtedness within the meaning of the Constitution." The court then proceeded to examine and reject the case of Doon Twp. v. Cummins, 142 U. S. 366, saying the correct rule was stated in the dissenting opinion. [Los Angeles v. Teed, 112 Cal. 319, 327.]

There are other authorities of like tenor, including 5 McQuillin, Mun. Corp., sec. 2270; 1 Dillon, Mun. Corp. 379; Hirt v. City of Erie, 200 Pa. St. 223; Hotchkiss v. Marion, 12 Mont. 218, followed in Palmer v. City of Helena, 19 Mont. 61; Ewert v. Mallery, 16 S. Dak. 151;

Hamilton Co. v. Sav. Bank, 157 Fed. 19; Morris v. Taylor, 31 Ore. 62.

It seems to me this is the doctrine of both the majority and the minority opinions in State ex rel. v. Neosho, 203 Mo. 40; of the majority opinion by implication and of the minority one by express statement (p. 95).

It will be observed the question has been presented to the courts in this phase: That bonds intended to be issued to fund a floating debt or refund prior bonds, would increase the total indebtedness of the public corporation beyond the constitutional limit; in dealing with which proposition the courts, if not uniformily, yet nearly so, have held the constitutional limitation would not be exceeded, because the new bonds would not constitute a new debt; therefore, would not increase the indebtedness. But the principle of the decisions is that such a funding or refunding of bonds is not a "becoming indebted" on the part of a municipality or county, for the reason that it is already indebted and is simply changing the evidence or form of the indebtedness. If the issue of bonds is not a new debt, when to hold it is would stand in the way of the issue as being an infringement of the Constitution, it is difficult to perceive how it can be a new debt, when to so hold will sanction the issue as constitutional. But regardless of the technical distinctions taken in this connection, the essential fact is that Section 12, and similar limitations, were not adopted with reference to refunding debts, but with reference to incurring them.

For the foregoing reasons I respectfully dissent from the majority opinion herein.